UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MAX FREIDZON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 CV 5445 |
| -against- | ) | *PROPOSed* |
| | ) | |
| ALEXEY BORISOVICH MILLER, | ) | **AMENDED COMPLAINT** |
| ALEXANDER VALERYEVICH | ) | |
| DYUKOV, GRAHAM SMITH, | ) | |
| ALI IZMAILOVICH BEGLOV, | ) | |
| OAO LUKOIL, LUKOIL NORTH | ) | |
| AMERICA, LLC, OAO GAZPROM, | ) | |
| JSC GAZPROM NEFT, | ) | |
| and GAZPROMNEFT-AERO | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff, Max Freidzon ("Plaintiff") brings this Complaint against Mr. Alexey Borisovich Miller, Mr. Alexander Valeryevich Dyukov, Mr. Graham Smith, Mr. Ali Izmailovich Beglov, OAO Lukoil, Lukoil North America, LLC, OAO Gazprom, JSC Gazprom Neft, and Gazpromneft-Aero (collectively, the "Defendants"). In support thereof, Plaintiff alleges the following:

## NATURE OF THE ACTION

1. Freidzon co-founded a holding company named Sigma. Sigma was created to pursue a number of common business interests.

2. Freidzon owned twenty nine percent of shares (29%) in Sigma. Dmitry Skigin (now deceased) was Freidzon's business partner and owned the remaining seventy one percent of shares (71%) in Sigma.

3. Sigma, managed by Freidzon and Skigin, created another company called Sovex. Sovex was an oil distribution company.

4. Sigma, the holding company, owned sixty six percent (66%) of shares in Sovex. The remaining thirty four percent (34%) was owned by a Lichtenstein company named Horizon Trading. Horizon Trading was under Mr. Graham Smith's management.

5. As alleged more fully below, Defendants have engaged in an organized international criminal activity which resulted, *inter alia*, in the forced loss of Freidzon's shareholding interest in Sigma and Sovex, grave physical attacks, attempts on Freidzon's life, and subsequent repeated threats (the "Illegal Scheme") and are now unlawful owners of Freidzon's shares in Sovex.

6. Pursuant to Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq*. and other laws, Freidzon seeks to recover over $180.3 million in compensatory damages as well as at least $360.6 million based upon the trebling of its compensatory damages, punitive damages, costs, and attorneys' fees, for losses from the Illegal Scheme.

## JURISDICTION

7. This action arises under the laws of the United States, specifically the RICO Act, 18 U.S.C § 1961 et. seq.

8. This Court has subject matter jurisdiction to hear this action under at least 28 U.S.C. §§ 1331, 1337, and 1367.

9. Jurisdiction also lies pursuant to 28 U.S.C. §1332(a) because there is diversity of citizenship between Freidzon and Defendants and amount in controversy exceeds $75,000.

10. Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because events and transactions have taken place in this District and because one of the Defendants resides here.

## PARTIES

11. Plaintiff Max Freidzon ("Freidzon") is an individual citizen of the State of Israel and of the Russian Federation.

12. Mr. Alexey Borisovich Miller ("Miller") is a Deputy Chairman of the Board of Directors and Chairman of the Management Committee (CEO) of Russian energy company OAO Gazprom.

13. Mr. Alexander Valeryevich Dyukov ("Dyukov") is a Chairman of the management Board of Gazprom Neft, one of Russia's top-5 vertically integrated oil companies by production and amongst the largest oil companies in the world by proven reserves.

14. Mr. Graham Smith ("Smith") currently resides in Lichtenstein and is a national of Monaco and England. Smith managed the assets of Horizon Trading which later came under the control of Sotrama.

15. Ali Izmailovich Beglov ("Beglov") is a general director of Lukoil Bunker, oil and bunkering company in Russia.

16. OAO Lukoil ("Lukoil") is an open joint stock company (public corporation) organized under the laws of and maintains its principal place of business in the Russian Federation. Lukoil is Russia's largest oil company and one of Russia's most powerful economic entities. Lukoil and/or its wholly-owned and controlled subsidiaries export petroleum to the United States.

17. Lukoil North America, LLC ("LNA") is an indirect wholly-owned subsidiary of Lukoil, headquartered in New York with its main office and mailing address at 505 Fifth Ave, 9th Floor, New York, New York, 10017, as listed on LNA's website, http://www.lukoilamericas.com/, and has a Registered Agent, CT Corporation System, located at 111 Eighth Avenue, New York, New York, 10011. LNA markets Lukoil-branded motor fuels and lubricants through a network of over 500 Lukoil-branded service stations across Northeastern and Mid-Atlantic United States. In addition, LNA offers various associate services, including fleet fueling.

18. OAO Gazprom ("Gazprom") is an open joint stock company that supplies energy to domestic and foreign customers. Gazprom and/or its wholly-owned and controlled subsidiaries export petroleum products to the United States, specifically to Los Angeles, Denver, San Diego, Atlanta, Boston, Philadelphia, Houston, and Chicago.

19. JSC Gazprom Neft ("Neft") is a vertically integrated oil company primarily owned by Gazprom. Neft engages in the sale and distribution of crude oil, and the production and sale of petroleum products. Neft supplies fuel to foreign airlines including those of the United States.

20. Gazpromneft-Aero ("Aero") is the aviation-fuel business operator of Neft. Aero supplies jet fuel to the domestic and foreign airlines. Specifically Aero supplies fuel to many American airlines, including but not limited to AirTran Airways, American Airlines, Delta Airlines, etc.

21. Defendants Lukoil and LNA being vertically integrated and thereby benefitting from each other's transactions will be referred to jointly as "Lukoil Defendants."

22. Defendants Gazprom, Neft, and Aero being vertically integrated and thereby benefitting from each other's transactions will be referred to jointly as "Gazprom Defendants."

23. Defendants engaged in export business with the United States. According to the Russian authorities, providing fuel to foreign airlines is considered an export business.

## FACTUAL BACKGROUND

**A.    Mr. Freidzon is a Rightful Owner of Sigma and Sovex Shares**

24. In 1994 Freidzon and his partner Mr. Dmitry Skigin ("Skigin") co-founded Sigma, a holding company created to pursue a number of common business interests. Freidzon owned twenty nine percent (29%) of shares in Sigma, while Skigin owned the remaining seventy one percent (71%). (Exhibit A (copy of Freidzon's Stock Certificate in Sigma showing a 29% interest with translation)); (Exhibit B (an extract from the registry of shareholders of the privately held corporation "Sigma" No. 02-B, referring to Freidzon's ownership of 29% of Sigma with translation.)).[1]

25. In 1995 Freidzon and Skigin co-founded Sovex, an oil distribution company based in St. Petersburg, Russia. Sovex's tax identification number is #7813031424.

26. Sigma owned sixty six percent (66%) of Sovex's stock. The remaining thirty four percent (34%) was owned by Horizon International Trading Ltd. ("Horizon Trading") represented by Smith. (Exhibit C

---

[1] Sigma is no longer an active corporation.

(an extract from the registry of shareholders of privately held corporation "Sovex," referring to Sigma's ownership interest in Sovex with translation.)).[2]

27. At the time of Sovex's creation, Dyukov was a financial officer working under Skigin. Dyukov was responsible for overseeing the accounting work, producing Sovex's financial records, and had reporting responsibilities to the Russian tax authorities. Dyukov also managed the cash accounts across all of Skigin's various operations, including money transfers between these operations, Horizon Trading and Sotrama.[3]

28. Also at the time of Sovex's creation, Miller served with the Committee for External Relations of the St. Petersburg Mayor's Office. In this official government capacity, Miller assisted Skigin and Freidzon in registering Sigma and Sovex.[4],[5]

29. Miller and Dyukov both had direct knowledge of Sigma and Sovex's shareholding structures, as well as Freidzon's rightful ownership interests in the companies.

30. During the relevant timeframe, Beglov worked as a manager for Lukoil Neva (which later became Lukoil Bunkering) and in that capacity came to know Skigin (in or around 1995).

---

[2] Horizon Trading came under the control of Sotrama, a Monaco-based company, owned by Skigin and managed by Smith. Sotrama was investigated by the Monegasque authorities for allegations of money laundering activities. Sotrama was part of oil trade network set up all across Europe by the Russian leader and his confidants. Sotrama was used in money laundering of funds embezzled from the federal budget through investments in real estate in Europe.

[3] In or around 1995, Skigin formed another company, Petersburg Oil Terminal 5 ("POT") with another partner, Mr. Ilya Traber. Dyukov served as Director General of POT from 1996-1998. POT became a supplier of oil products to Sovex. Today, POT is owned by a number of Cyprus-based offshore companies principally controlled by Mr. Sergei Vasiliev, a well-known St. Petersburg-based criminal.

[4] Miller later became Director for Development and Investments for OBIP (the "Association of Banks Supporting Investments in St. Petersburg Port"), which was managed by Messrs. Traber and Skigin. The largest shareholder of OBIP was NASDOR, a Lichtenstein company registered at Graham Smith's business address, and controlled by Ilya Traber and other investors. Miller was in frequent contacts with Smith and represented the interest of OBIP in those transactions. Following the assassination of OBIP's competitor and a City official, a bloody struggle for control of the Saint Petersburg Port, ended with OBIP being awarded a city contract to manage the Port in 1997.

[5] Miller and Dyukov worked for OBIP under the supervision of Mr. Traber, who in turn was following orders from Sergei Vasiliev and Vladimir Kumarin.

31. Sovex's business activity involved the sale of jet fuel to domestic and foreign airlines landing at Pulkovo Airport in Saint Petersburg, Russia. Sovex gained an exclusive relationship with Pulkovo Airport from 1995 to 2013, and the volume of aero fuel it sold in 2012 reached 400,000 tons. From 2007 to 2011, Sovex's revenues reached USD $1.26 Billion, and net income after taxes reached USD $131 Million.

32. To this day Freidzon is a rightful owner of Sigma and Sovex's shares. Freidzon did not authorize disposition of his shares to anyone, nor has received any compensation for his shares.

## B.   Criminal Activity that Ousted Mr. Freidzon from Sovex

33. Starting in 1997, Sovex's cash flow was captured and controlled by well-known Russian criminals, Messrs. Sergei Vasiliev and Vladimir Kumarin (aka Barsukov).[6]

34. In 1997, Messrs. Vasiliev and Kumarin who were associated with Mr. Traber, used Sovex and some other oil trading firms to illegally launder money out of the Russian Federation.

35. Messrs. Vasiliev and Kumarin used Sovex, to not only avoid tax ramifications which resulted in enormous revenue loss for the Russian Federation, but also laundered profits from criminal activities.

36. The oil money was illegally funneled from Sovex under the umbrella of Sotrama to three Russian companies: Sinex, Sinex Bank and Sinex Securities, all Russian owned, to Torfinex Corp, owned by Alexander Volkov, to the two different accounts with Bank of New York, Benex and BECS, which were administered by Natalia Gurfinkel.

37. After the money was "cleaned" through Bank of New York, the money was transferred back to Lichtenstein through Sotrama owned by Skigin and managed by Smith to further sponsor criminal activities.[789]

---

[6] Mr. Kumarin is widely known as the co-founder of the Tambov Gang, a violent St. Petersburg-based criminal group. (The other alleged Tambov Gang co-founder, Mr. Valery Ledovskih, is currently a CEO of Gazprom Neft, St. Petersburg.).

[7] Some of the "cleaned" money was used to create new businesses and entities, such as POT and OBIP and helped bring cash flow to Horizon Trading in Lichtenstein. The above mentioned scheme was conducted with the assistance of Smith and Skigin.

38. Unknown to Freidzon, in or around 1997, Mr. Vasiliev ordered Mr. Traber to take Sovex's incorporation documents, as well as the corporate seals, from the Sovex manager's office, and alter the ownership records. Miller, Dyakov, Smith, Beglov, and Skigin all collaborated in this scheme.

39. Thereafter, Sigma and Horizon Trading disappeared from the list of founders-shareholders of Sovex, and instead in 2002 two outside individuals with no prior ties to Sovex, Messrs. Alexander Ulanov and Viktor Korytov (currently Deputy Chairman of the Board at Gazprombank) took a 3.2% and 0.8% interest, respectively, in Sovex. The rest of the shares remained "conveniently" undistributed.

40. Freidzon, being on the technical side of Sovex's business, was unaware that documents were being falsified and that his name was quietly removed. No document exists that Freidzon's shares were bought out, transferred, etc. Meanwhile, Miller, Dyakov, Smith, Beglov and Skigin kept reassuring Freidzon that business is as usual.

41. Freidzon attempted to gain access to the financial records of the company, however, met a slew of excuses that prevented him from doing so.

42. Still unwitting about the scheme, Freidzon continued his attempts to access companies' records; however his attempts were all in vein.

43. Finally, in 2012 Freidzon was able to obtain access to documents pertaining to Sovex. At that time, Freidzon realized that the documents have been falsified and his name had mysteriously disappeared back in 2002 from the list of shareholders. Again, no document exists that his shares were bought, transferred, or lawfully disposed of.

44. Freidzon became aware that he was deprived of his shares in 2012.

45. Freidzon immediately attempted to resolve this misunderstanding. His attempts resulted in numerous life threatening phone calls and physical attacks.

---

[8] Skigin later moved to Monaco, but was deported by the Monegasque authorities for his suspected involvement in fraud and money laundering activities.

[9] In 2005, the Bank of New York settled a related money laundering suit with the federal government for $38 million.

**C.** **Sovex is Directly Linked to the Bank of New York Money Laundering Scandal**

46. Sovex was created in 1995. Sovex's tax identification number is #7813031424.

47. Sovex was used in the conspiracy to illegally transmit funds and receive deposits through the Benex and BECS - accounts at the Bank of New York. Torfinex, a company owned by Alexander Volkov, handled the transfer of money. Skigin collaborated with Volkov on these transactions.[10]

48. The U.S. Attorney's Office in Manhattan charged Benex, BECS and a third firm, Torfinex Corp., along with three Russian emigres, with conspiracy to illegally transmit and receive money.[11]

49. Messrs. Volkov and Berlin and the companies they controlled were also charged with two additional counts, illegal money transmitting and receiving deposits illegally. All the charges were connected to the Bank of New York investigation.[12]

50. Once the money was cleared, it was sent back through Sotrama, a Lichtenstein company founded by Skigin and managed by Smith to further support the criminal activities.

51. Sovex, continued to bring money and all the Defendants continued to benefit from its revenues.

**D.** **Defendants Continue to Financially Benefit from Freidzon's Shares**

52. Defendants Dyakov, Miller, Beglov, Smith, and later Gazprom and Lukoil Defendants along with Traber and Skigin all collaborated in wrongful and unlawful takeover of Freidzon's Sovex shares and continue to rip financial rewards from them.

53. Defendants Dyakov, Miller, and Beglov purposefully falsified origination documents whereby removing Freidzon's name (along with Sigma and Horizon Trading) from the list of shareholders.

---

[10] Russian Federation was given 4.8 billion tranche of IMF credit. The money was instantaneously stolen and through a complex network of money laundering transactions was cleared through the Bank of New York. Sovex was instrumental in these operations.

[11] The three individuals are Peter Berlin, a principal of Benex; his wife, Lucy Edwards, a fired executive of Bank of New York; and Aleksey Volkov, who ran Torfinex.

[12] On 14 August 2000, Reuters reported that a Swiss magistrate, Laurent Kasper-Ansermet, said he had raided two banks that same day as part of a probe into whether a $4.8 billion tranche of IMF credit for Russia was diverted via secret Swiss bank accounts. Kasper-Ansermet also told the news agency that he was going to the United States to seek U.S. cooperation in his probe into possible Swiss links to a massive Russian money-laundering case involving the Bank of New York.

Defendants fraudulently left ninety six percent (96%) of shares in Sovex unassigned with the sole purpose of assigning those shares to themselves when the opportunity presented.

54. Defendants Dyakov, Miller, and Beglov did not have to wait to long for their criminal partners to place them in positions of authority, namely at the head of the State run oil companies, Gazprom and Lukoil, and all their subsidiaries, and divided up Sovex's shares amongst themselves in what "appeared" to be a proper purchase of Sovex by Defendants.

55. Freidzon was never compensated for his shares. The shares were simply stolen from him.

56. On March 23, 2007, Lukoil and Neft signed an agreement to cooperate in the distribution of jet fuel in the northwest of Russia, and in particular Saint Petersburg.[13]

57. Pursuant to the agreement Lukoil and Neft assumed and equally divided Sovex's unapportioned shares.

58. Defendants had Sovex's records altered. All Defendants were aware that 29% of 66% of shares in Sovex belonged to Freidzon, however, they proceeded with purchase of Sovex having offered no compensation to Freidzon.

59. On December 21, 2007, Aero petitioned the Russia's Federal Anti-Monopoly Service ("FAS") to acquire 50 percent of the share capital of "Refueling North-West." Per Refueling North-West agreement, Gazprom Neft acquired 50% of "Refueling North-West's shares in February 2008.

60. On November 23, 2006 Mr. Dyukov was appointed Acting President of JSC Gazprom Neft, and on December 30, 2006 he was elected President. Alexei Miller has been Chairman of Gazprom's Management Committee since 2001, and Chairman of Gazprom Neft since its inception. Both were in position of authority and key decision makers at Gazprom-Neft during the time when Lukoil created Refueling North-West and decided to acquire JSC Sovex.

---

[13] Under this agreement, Lukoil and Gazprom Neft agreed to form a new corporation, "Refueling North-West", with 50% ownership interest each. In paragraph 2 of this Agreement the parties decided that "Refueling North-West" shall acquire ownership of 99.2% of the voting shares of JSC "SOVEX". In October 2007 "Refueling North-West" was established by Lukoil-Aero in accordance to this Agreement, and on December 10, 2007 "Lukoil" and "Lukoil - Aero" decided that "Refueling North-West" will acquire 99.2% of JSC "SOVEX."

61. As previously stated both Mr. Dyukov, Mr. Miller, and Beglov had personal knowledge of Freidzon's interest and ownership structure of Sovex. As of 2007, the purported ownership structure was inconsistent with facts personally known to Dyukov, Miller, and Beglov. Dyukov, Miller, and Beglov were in the position of authority at the time Defendants Lukoil and Gazprom acquired Sovex. Defendants Lukoil and Gazprom, nevertheless proceeded with the acquisition of Sovex without compensating Freidzon for his shares.

62. As a result Defendants fraudulently ousted Freidzon from his rightful ownership of Sovex's shares.

## E.     Mr. Freidzon's Attempts to Regain Ownership Interests both Failed and Resulted in Threats and Physical Attacks

63. Throughout the period of 2001-2002, Freidzon attempted to regain access to Sovex's records to verify his stock ownership. However, his attempts were met by Smith's threats saying that should Freidzon pursue his attempts, Freidzon "will be found dead."

64. In 2003, Skigin, Freidzon's partner, passed away. Freidzon again attempted to access the records of Sigma and Sovex, through the legal process in the Russian courts. At that time, Freidzon received several threatening anonymous telephone calls.

65. On December 21, 2003, Freidzon received a lead that told him to meet a source at a hotel in St. Petersburg where he would be able to review the records. Freidzon, eager to finally learn the truth, went to the designated area, where he was physically attacked. His assailants told him to forget about getting any information on Sigma and Sovex. Freidzon woke up in a hospital with broken legs, a concussion, pierced pancreas, and a bleeding intestine. (Exhibit D (a copy of Freidzon's hospital record listing injuries and medical physician's evaluation that the attack was life-threatening, is attached.))[14]

66. Freidzon remained hospital-bound for two months and thereafter, fled to Israel. While at the St. Petersburg Airport, Freidzon received another threatening telephone call telling him that his assailants

---

[14] A criminal investigation was launched following this brutal attack, however, was abruptly terminated soon after.

knew where Freidzon was staying in Israel and that he would be attacked in the event he choose to pursue this fight.

67. In 2006, while Lukoil Defendants were negotiating a purchase of Sovex with unknown parties, Freidzon filed another complaint with the Russian Prosecutor's office citing threats, physical attacks and his inability to obtain any information as to his status with Sigma and Sovex.[15]

68. At no point did Miller, Dyakov, Beglov leading the giant oil companies, consult with Freidzon, pay Freidzon for his shares of the company that he created.

69. Following the filing of the complaint, while in St Petersburg, and later in Israel, Freidzon received several more life threatening anonymous telephone calls.

70. Finally, in 2012 Freidzon was able to obtain documents pertaining to Sovex's financial records and ownership papers. At that moment Freidzon, realized that the documents have been falsified and altered and that his name was unlawfully redacted thereby depriving him of his rightful ownership of Sigma and subsequently in Sovex's shares.

71. In 2012, Freidzon immediately initiated a legal proceeding with the Prosecutor's office, the police office, and the local court in St. Petersburg, Russia.

72. Freidzon eventually obtained a meeting with the police investigator where the police investigator told Freidzon that the names of Skigin and Smith could not be included in his complaint.

73. Once again, Freidzon received anonymous telephone calls threatening his life, both while he was at the airport returning to Israel and in Israel.

74. While in the United States in 2014, Freidzon again received an anonymous threatening telephone call.

## CAUSES OF ACTION

### First Cause of Action:
### (Federal Civil RICO, 18 U.S.C. § 1962(c))

---

[15] The Prosecutor of the Frunze district of Saint Petersburg accepted the complaint, initiated an investigation, and contacted Sigma and Sovex to discuss the allegations. However, the prosecutor then abruptly stopped the investigations and told Freidzon he could not help him.

**Against All Defendants**

75. Paragraphs 1 to 74 are incorporated as if fully set forth herein. The conduct of Defendants alleged violates 18 U.S.C. § 1962(c).

76. 18 U.S.C. § 1962(c) makes it unlawful to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. Defendants violated this statute, and as a result, Plaintiff was injured.

77. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

78. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

79. The Enterprise. Sovex is a legal entity within the meaning of 18 U.S.C. § 1961(4), and constitutes an enterprise within the meaning of the RICO statute.

80. Beginning at a time currently unknown to Plaintiff, Defendants became associated with Sovex.

81. Beginning at a time currently unknown to Plaintiff, Defendants participated in the conduct of the affairs of Sovex through a pattern of racketeering activity in the United States or foreign commerce as described in this complaint.

82. In addition or in the alternative, Defendants together formed an association-in-fact enterprise with a common and continuing purpose, constituting an enterprise within the meaning of 18 U.S.C. § 1961(4). The members of the enterprise functioned as a continuing unit that shared and continues to share a common purpose and relationship.

83. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1961(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise.

84. Predicate acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had similar purpose and result, participants, and method of commission.

85. Predicate Act: Money Laundering in Violation of 18 U.S.C. § 1956: Defendants committed an indictable offense of money laundering under 18 U.S.C. § 1956. The above named defendants transferred and transmitted money received from Freidzon's stocks to New York from places outside the United States with the intent to promote the carrying on of specified unlawful activity within the meaning of Section 1956(c)(7), including among other things, fraud. Other defendants continued to profit from the proceeds received from these illegal acts.

86. Predicate Act: Theft 18 U.S.C. § 1961(1)(b): Defendants committed an indictable offense of theft under 18 U.S.C. § 1961. The above named defendants illegally obtained Sovex's documents and altered the records thus deleting the original owners from the stock certificates and unlawfully reassigned the stock certificates to them in the companies that they were appointed to head.

87. Predicate Act: Extortion of 18 U.S.C. § 1961(1)(a): Defendants committed an indictable offense of extortion 18 U.S.C. § 1961. The above named defendants though unlawful life threatening threats and physical attacks continue to prevent Freidzon from ascertaining his rightful ownership of his stocks in Sovex.

88. Continuity of Conduct: Defendants' violation of state and federal laws as set forth herein, each of which directly and proximately injured Plaintiff demonstrates a course of conduct spanning a period of time unknown to Plaintiff through the present and that continues into the indefinite future with no stopping point.

89. The Defendants are reaping profits from the enterprise created by the Plaintiff without any compensation to the Plaintiff.

*Second Cause of Action:*
*(Federal Civil RICO, 18 U.S.C. § 1962(b))*
*Against All Defendants*

90. Paragraphs 1 to 89 are incorporated as if fully set forth herein. The conduct of Defendants alleged violates 18 U.S.C. § 1962(b).

91. 18 U.S.C. § 1962(b) makes it unlawful to acquire or maintain, via a pattern of racketeering activity, any interest in or control of any enterprise engaged in or affecting interstate or foreign commerce.

92. Defendants are each legal entities within the meaning of 18 U.S.C. § 1961(4) are either engaged in interstate or foreign commerce or undertake or caused activities to be undertaken that affect interstate or foreign commerce.

93. Defendants acquired control and maintained control over Sovex through a pattern of racketeering activity as described in greater detail above. Among other predicate acts, the Defendants were able to obtain control of Sovex by the commission of crimes such as fraud, extortion, falsifying records, money laundering and use of interstate or foreign facilities to further their actions.

94. The elements of Section of 1962(c) that are common with Section 1962(b) are satisfied, as described above in the First Cause of Action.

95. Plaintiff has sustained an "acquisition injury" that is separate and distinct from the harm caused by the RICO predicate acts. As a result of the acquisition of an interest in Sovex by Defendants, Plaintiff is deprived of his right to control the value of his stocks.

### Third Cause of Action:
### (Violation of Minority Shareholder Rights)
### Against All Defendants

96. Paragraphs 1 to 95 are incorporated as if fully set forth herein. The conduct of Defendants constitutes violation of minority shareholder's rights under Russian Federal Law No. 208-FZ on Joint Stock Companies, Art. 79(3).

97. According to Russian law, "[t]he decision to approve a major deal of which the subject matter is assets worth over fifty percent (50%) of the balance sheet value of the company's assets shall be adopted by a general meeting of shareholders by a majority of three quarters of the votes of shareholders owning

voting shares and attending the general meeting of shareholders." Russian Federal Law No. 208-FZ on Joint Stock Companies, Art. 79(3).

98. The remedy for a breach of this provision is that "[a] major deal accomplished in breach of the provisions of the present article may be recognized as null and void on the company's or a shareholder's complaint." Id. at Art. 79(6) (emphasis added).

99. Here, Sigma's only asset was Sovex, of which Freidzon owned 19.14% shares.

100. As a result, Sigma could not sell Sovex without a shareholder's meeting and subsequently Freidzon's approval; however, Sigma did not hold a shareholder's meeting, violating Article 79(3).

101. Freidzon has been damaged as a result. Accordingly, Defendants must return Freidzon's shares or compensate him for the value of those shares.

### Forth Cause of Action:
### (Unjust Enrichment)
### Against All Defendants

102. Paragraphs 1 to 101 are incorporated as if fully set forth herein. The conduct of Defendants constitutes violation of Russia Civ. Code Art. 1102(1).

103. Under Russian law, a "person who has acquired . . . property (purchaser) without the grounds, established by the law, other legal acts or the transaction, at the expense of another person (victim) shall be obliged to return to the latter the property acquired or saved unjustly (unjust enrichment), except for the cases, provided for by Article 1109." Russia Civ. Code Art. 1102(1).

104. Furthermore, the purchaser must return the property regardless of whether the purchaser was at fault. Russia Civ. Code Art. 1102(2). And if the purchaser cannot return the property in kind, "the purchaser shall compensate to the victim for the actual value of this property at the time of its acquisition, and also for the losses, caused by the subsequent change in the value of property, if the purchaser has not reimbursed its value at once after he has known about unjust enrichment." Russia Civ. Code Art. 1105(1).

105.     Here, Defendants unjustly acquired Freidzon's shares of Sovex, and Freidzon has been damage as a result. Accordingly, Defendants must return Freidzon's shares or compensate him for the value of those shares.

### Fifth Cause of Action:
### (Fraud)
### Against All Defendants

106.     Paragraphs 1 to 105 are incorporated as if fully set forth herein. The conduct of Defendants violates the fraud claim under Chapter 59 and Chapter 60 of the Civil Code of Russia.

107.     Russia's Civil Code creates a general obligation to provide compensation for harm caused by the violation of a legal duty, to return unjustly obtained property, and to compensate for injuries caused by an unlawful taking, potentially in excess of the actual loss.

108.     Under the Civil Code, a party may seek compensation for damages caused by the fraudulent actions of another without any prior proof of criminal misconduct.

109.     Defendants fraudulently obtained Freidzon's shares of Sovex and Freidzon has been damaged as a result. Accordingly, Defendants must return Freidzon's shares or compensate him for the value of those shares.

### Sixth Cause of Action:
### (Conversion)
### Against All Defendants

110.     Paragraphs 1 to 109 are incorporated as if fully set forth herein. The conduct of Defendants constitutes violation of Russia Civ. Code Art. 1064.

111.     If a sale is completed and another party absconded with a buyer's share of the money, it constitutes the tort of conversion. Likewise, the "injury inflicted on the . . . property of an individual . . . shall be subject to full compensation by the person who inflicted the damage." Russia Civ. Code Art. 1064.

112.     Here, Defendants converted Freidzon's shares of Sovex, and Freidzon has been damaged as a result. Accordingly, Defendants must return Freidzon's shares or compensate him for the value of those shares.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

A. Award Plaintiff compensatory damages as provided bylaw;

B. Award Plaintiff punitive damages as proved by law;

C. Award Plaintiff treble damages as provided by law;

D. Award injunctive relief against further violations;

E. Declare, adjudge, and decree that Max Freidzon is the lawful owner of Sigma's 29% of shares which is a lawful owner of 66% of shares of Sovex or an owner of 19.14% of shares in Sovex;

F. Impose a constructive trust in favor of Plaintiff on any assets Freidzon may have;

G. Order an accounting with respect to any assets of Sovex and Defendants;

H. Award Plaintiff his reasonable attorneys' fees and costs; and

I. Award Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demand trial by jury on issues so triable.

Dated:  New York, New York
         October 22, 2014

By: _____
Max Freidzon
588 West End Avenue, Apt. 15B
New York, NY 10024
Tel: 408-771-4450

# EXHIBIT A

## Закрытое акционерное общество "СИГМА"

191182, Санкт-Петербург, Лиговский пр. д.29, пом. 12-Н

## Сертификат акций №4.

*Акции обыкновенные именные документарные*

*Государственный регистрационный номер* **1-01-07877-J.**

**Порядок размещения ценных бумаг:**

**Способ размещения:** *распределение среди учредителей*

**Срок и порядок размещения ценных бумаг:**

    Дата распределения: *11 марта 1994 года.*

    Условия и порядок размещения:

*Оплата производится денежными средствами - 100 % до момента государственной регистрации Общества. Денежные средства подлежат зачислению на расчетный счет Общества.*

**Цена (цены) размещения одной ценной бумаги выпуска**

    *0,1 рублей (100 рублей в старом масштабе цен, до деноминации)*

**Условия и порядок оплаты ценных бумаг выпуска.**

    *При приобретении ценных бумаг выпуска предусмотрена форма оплаты деньгами.*

**Эмитент обязуется обеспечить права владельца при соблюдении владельцем требований законодательства Российской Федерации;**

**Настоящий сертификат удостоверяет 29 (двадцать девять) обыкновенных именных документарных акций номиналом 10 (десять) копеек.**

**Наименование владельца акций, удостоверенных настоящим сертификатом:**

## *ФРЕЙДЗОН МАКСИМ РОБЕРТОВИЧ.*

Общее количество выпущенных акций с данным государственным регистрационным номером: **100 (сто).**
**Акции выпущены в документарной форме без обязательного централизованного хранения.**

М.П.

Генеральный директор:      *Свертин С.В.*
Главный бухгалтер:      *Бабичева И.А*
Лицо, выдавшее сертификат:      *Свертин С.В*

# Max's Stock Certificate No. 4 of 29% shares of Sigma

Private join-stock company "Sigma"
191182, St. Petersburg, Ligovsky Prospect 29, 12-H

Stock certificate No. 4

Regular named documented shares

State registration number 1-01-07877-J

The order of issuance of the securities:

Method of issuance: distribution among the founding members

Date and order of issuance of the securities:
Date of distribution: 11 March 1994.
Conditions and order of issuance:
The payment is made in money – 100% until state registration of the company. Money is to be posted to the company account.

Price (prices) of issuance of each security:
0.1 RU (100 old rubles, pre-devaluation)

Conditions and order of payment for securities:
When purchasing the securities, money payment is expected.

The issuer is obliged to provide ownership rights if the owner is to adhere to legal requirements of the Russian Federation;

The present certificate confirms the issuance of 29 (twenty nine) regular named documented shares at face value of 10 (ten) kopecks.

Name of the share owner confirmed by the present certificate:

FREIDZON MAXIM ROBERTOVICH

The total quantity of issued shares with the present state registration number: 100 (one hundred).
The shares are issued in documented form without mandatory centralized storage.

General director:            [signature and name]
Chief accountant:            [signature and name]
Person issuing the certificate:    [signature and name]

# EXHIBIT B

# Выписка
## из реестра акционеров Закрытого акционерного общества «Сигма» № 02-В

Санкт-Петербург                                    "10" августа 2000 года

ПОЛНОЕ НАИМЕНОВАНИЕ: *Закрытое акционерное общество «Сигма»*
МЕСТОНАХОЖДЕНИЯ: *191186, Санкт-Петербург, Лиговский пр., д.29, пом. 12-Н*
ТЕЛЕФОН: *(812)* _____
НАИМЕНОВАНИЕ ГОСУДАРСТВЕННОГО ОРГАНА, ОСУЩЕСТВИВШЕГО РЕГИСТРАЦИЮ ЭМИТЕНТА:
*Администрация Куйбышевского района Санкт-Петербурга*
НОМЕР И ДАТА ГОСУДАРСТВЕННОЙ РЕГИСТРАЦИИ ЭМИТЕНТА: *Свидетельство о государственной регистрации № 1373 от 11 марта 1994 года.*

ВЫДАНА: *Фрейдзону Максиму Робертовичу*
ЛИЦЕВОЙ СЧЕТ №: *003*

НА ДАТУ ПРЕДОСТАВЛЕНИЯ ДАННОЙ ВЫПИСКИ НА ЛИЦЕВОМ СЧЕТЕ №002, ОТКРЫТОМ НА ИМЯ *Фрейдзона Максима Робертовича* ( ВЛАДЕЛЕЦ ) НАХОДЯТСЯ АКЦИИ:

КОЛИЧЕСТВО: *29 (двадцать девять) штук*
          ИЗ НИХ:
ОБЫКНОВЕННЫЕ ИМЕННЫЕ ДОКУМЕНТАРНЫЕ, Г. РЕГ. № ВЫПУСКА 1-01-07877-J:

*29 (двадцать девять) акций*

ГОСУДАРСТВЕННЫЙ ОРГАН ОСУЩЕСТВИВШИЙ РЕГИСТРАЦИЮ: *Санкт-Петербургское региональное отделение ФКЦБ России*
ВЫПУСК ЗАРЕГИСТРИРОВАН: *на основании распоряжения Санкт-Петербургского регионального отделения ФКЦБ России от 09августа 2000 года №3050*

ИЗ НИХ ОБРЕМЕНЕНЫ: *нет.*
ОСУЩЕСТВЛЕНО БЛОКИРОВАНИЕ В ОТНОШЕНИИ: *нет*

РЕГИСТРАТОР: *нет*
ОРГАН ОСУЩЕСТВИВШИЙ РЕГИСТРАЦИЮ РЕГИСТРАТОРА: *нет*
ДАТА И НОМЕР РЕГИСТРАЦИИ : *нет*
МЕСТО НАХОЖДЕНИЯ И ТЕЛЕФОН РЕГИСТРАТОРА: *нет*

ДАННЫЕ В ВЫПИСКЕ ПРЕДСТАВЛЕНЫ НА ДАТУ: *«10» августа 2000 года*
ВЫПИСКА ИЗ РЕЕСТРА АКЦИОНЕРОВ НЕ ЯВЛЯЕТСЯ ЦЕННОЙ БУМАГОЙ

Уполномоченное лицо:

Генеральный
директор ЗАО «Сигма»                    *Обер - 1 Обертас С.В.*

*Копия верна.*
*Обер - 1Обертас С.В*

# Extract from the registry of shareholders of the privately held corporation "Sigma" No. 02-B, referring to Max's ownership of 29% of Sigma

St. Petersburg                                                        10 August 2000

FULL TITLE:   Private join-stock company "Sigma"
LOCATION:          191186, St. Petersburg, Ligovsky Prospect 29, suite 12-H
TELEPHONE: (812)
TITLE OF THE REGISTERING STATE ENTITY FOR THE ISSUER:
The Administration of the Kuibyshev District of St. Petersburg
REGISTRATION NUMBER AND THE DATE OF REGISTRATION OF THE ISSUER:
State registration certificate No. 1373 of 11 March 1994

ISSUED TO: Freidzon Maxim Robertovich
BUSINESS ACCOUNT No. 603

AS OF THE DATE OF PRESENTATION OF THE PRESENT EXTRACT, BUSINESS ACCOUNT No. 002,
OPENED UNDER THE NAME OF Freidzon Maxim Robertovich (OWNER) CONTAINS THE
FOLLOWING SHARES:

QUANTITY: 29 (twenty nine)
        OF WHICH:
REGULAR NAMED DOCUMENTED, ISSUE No. 1-01-07877-J:
29 (twenty nine)

REGISTERING STATE ENTITY: St. Petersburg regional branch of FCSM Russia [Federal Commission for
the Securities Market]

ISSUANCE REGISTERED: upon the order of St. Petersburg regional branch of FCSM Russia of 09 August
2000 No. 3050
OF WHICH ARE ENCUMBRED: *none*
OF WHICH ARE BLOCKED: *none*

REGISTRAR: *none*
ENTITY REGISTERING THE REGISTRAR: *none*
DATE AND REGISTRATION NUMBER: *none*

INFORMATION IN THE EXTRACT WAS PRESENTED ON THE DATE: 10 August 2000
EXTRACT FROM THE REGISTRY OF SHAREHOLDERS IS NOT CONSIDERED A VALUABLE SECURITY
 Authorized person:
General Director of "Sigma"

# EXHIBIT C

Copy of official registry of stock transactions
showing Sigma (66%) and Horizon (34%)
ownership as Founders of JSC "SOVEX".

# Совэкс (Совэксна Невском), ЗАО

ЗАРЕГИСТРИРОВАНО
" \_\_\_\_ " _____ 1998 г.

Санкт-Петербургское

Региональное отделение

ФКЦБ РОССИИ

_____ А.В. Буин

М.П.

## О Т Ч Е Т

ОБ ИТОГАХ ВЫПУСКА ЦЕННЫХ БУМАГ

ЗАКРЫТОЕ АКЦИОНЕРНОЕ ОБЩЕСТВО "СОВЭКС"

ОБЫКНОВЕННЫЕ ИМЕННЫЕ АКЦИИ ДОКУМЕНТАРНОЙ ФОРМЫ

ГОСУДАРСТВЕННЫЙ РЕГИСТРАЦИОННЫЙ НОМЕР ВЫПУСКА **72 - 1 - 5060**

Дата государственной регистрации выпуска "01" июля 1996 г.

Утвержден решением Общего Собрания акционеров ЗАО "СОВЭКС" "03" декабря
1998 г. Протокол № б/н.

Место нахождения, почтовый адрес эмитента и контактные телефоны :
Россия, 191025 , Санкт-Петербург, Невский проспект , д.100 , кв. 4.
Тел : 219-41-90.

Генеральный директор _____ / В.М. Им /

Главный бухгалтер _____ / Березкина Л.П./

"03" декабря 1998 г. М.П.

1. Дата распределения акций - 11.07.95 г.
2. Номинальная стоимость каждой акции - 1 000 ( Одна тысяча ) ( не деноминированных ) рублей , с учетом деноминации 1 ( Один ) рубль .

3. Количество размещенных акций - 49 000 ( Сорок девять тысяч ) штук обыкновенных именных акций.

4. Цена размещения ценных бумаг - 1 000 ( Одна тысяча ) ( не деноминированных ) рублей , с учетом деноминации 1 ( Один ) рубль .

5. Общая сумма ( стоимость ) имущества в рублях ( в том числе денежные средства в рублях , сумма иностранной валюты по курсу Центрального банка Российской Федерации на момент внесения и стоимость иного имущества ) , внесенного в оплату размещенных ценных бумаг - 49.000.000 ( Сорок девять миллионов ) ( не деноминированных ) рублей , с учетом деноминации 49 000 ( Сорок девять тысяч ) рублей , а также общая сумма ( стоимость) имущества в рублях ( в том числе денежные средства в рублях , сумма иностранной валюты по курсу Центрального банка Российской Федерации на дату утверждения отчета об итогах выпуска ценных бумаг и стоимость иного имущества ) , подлежащего внесению в оплату размещенных ценных бумаг в соответствии с договором о создании акционерного общества - 49.000.000 ( Сорок девять миллионов ) ( не деноминированных ) рублей , с учетом деноминации 49 000 ( Сорок девять тысяч ) рублей.
Сумма денежных средств в рублях , внесенная в оплату размещенных акций - 49.000.000 ( Сорок девять миллионов ) ( не деноминированных ) рублей , с учетом деноминации 49 000 ( Сорок девять тысяч ) рублей и сумма , подлежащая внесению в оплату размещенных ценных в соответствии с договором о создании акционерного общества - 49.000.000 ( Сорок девять миллионов ) ( не деноминированных ) рублей , с учетом деноминации 49 000 ( Сорок девять тысяч ) рублей.
Сумма иностранной валюты , выраженная в рублях по курсу Центрального банка Российской Федерации на момент внесения , внесенная в оплату размещенных акций - нет , а также сумма иностранной валюты , выраженная в рублях по курсу Центрального банка Российской Федерации на дату утверждения отчета об итогах выпуска ценных бумаг , подлежащая внесению в оплату размещенных ценных бумаг в соответствии с договором о создании акционерного общества - нет.
Стоимость иного имущества , внесенного в оплату размещ**************************************************************************************************
*****************************************************************************************************************
***********************************************************************************************************
***********************************************************************************************************
*************************************************e8и акционерного общества - нет .

6. Акционеры, владеющие не менее 2 % обыкновенных акций :

**АОЗТ " СИГМА "** -32 340 ( Тридцать две тысячи триста сорок ) штук - 66%;

**Международное торговое акционерное общество Хоризон Интернешнл Трэйдинг ЛТД** - 16 660 (Шестнадцать тысяч шестьсот шестьдесят) штук - 34%.

7. Совет Директоров ЗАО " СОВЭКС " не избирался.

8. Коллегиальный исполнительный орган ЗАО " СОВЭКС " не создавался.

7

9. Лицо, осуществляющее функции единоличного исполнительного органа - Им Василий Михайлович – Генеральный директор ЗАО " СОВЭКС " , в других организациях должностей не имеет , акциями Общества-эмитента не владеет.

SOVEX (Soveksna Nevsky), Inc.

Совэкс (Совэксна Невском)

Полное наименование: Закрытое акционерное общество "Совэкс"

Сокращенное наименование: ЗАО "Совэкс" на Невском

ИНН: 7813031424

Код эмитента: 04124-J

Место нахождения: 191025, Санкт-Петербург, Невский пр., д. 100, кв. 4

Почтовый адрес: 191025, Санкт-Петербург, Невский пр., д. 100, кв. 4

Телефон: 219-41-90

*Выпуски ценных бумаг*

| Номинал | Количество бумаг | Гос. регистрация | Способ размещения | Период/дата размещения | Текущее состояние | Фактически размещено | р |
|---------|------------------|------------------|-------------------|------------------------|-------------------|----------------------|---|
| **I. Акции обыкновенные** | | | | | | | |
| 1 | 49000 | 01.07.1996 72-1-5060 | приобретение акций учредителями общества | 11.07.1995 | размещение завершено | 49000 | |

Отчет об итогах выпуска

REGISTERED

"_____", The _____1998
St. Petersburg
Regional Office
FSC RUSSIA

A. _____ Buin

MP

## OTHET

### ABOUT THE OUTCOME OF ISSUE OF SECURITIES

Close corporation "SOVEX"

Ordinary registered shares of   the documentary form

STATE REGISTRATION NUMBER ISSUE **72 - 1 - 5060**

Date of state registration of the   "01"  July  1996

Approved   by the General Meeting of Shareholders   of JSC "SOVEX"   "03" December 1998
Minutes № b / n.

Location, postal address and contact telephone numbers:
Russia,    191025, St. Petersburg, Nevsky Prospect   , 100, app. 4.
Tel: 219-41-90.

Director General          _____          / VM His /

Chief Accountant        _____ / Berezkina LP /

"03"   in December 1998                          , MP

1.  Date of allotment of shares - 11/07/95, the

2. Nominal value of shares - 1 000 (one  one thousand  ) (not denominated)  rubles, including the denomination  1  (  one) ruble.

3. Number of shares -  49,000  (forty-nine thousand) ordinary registered shares.

4. offering price of securities - 1,000 (One  one thousand  ) (not denominated)  rubles, including the denomination  1  (one) ruble.

5. Total amount (value) of assets in rubles  (including cash in  rubles, the amount of foreign  currency at the exchange rate  of the Central Bank of the Russian Federation at the time of making  and the value of a  property),  introduced  for placed securities  - 49.000.000 (forty nine million  ) (non- denominated 49,000 (forty-nine thousand  ) rubles , as well as the total amount  (value) of assets in rubles  (including cash in  rubles, the amount of foreign  currency at the exchange rate  of the Central Bank of the Russian Federation on the date approval of the report  of the issue of securities and the value of other  assets) to be used as payment of placed securities in accordance with the agreement   on the establishment of joint stock company -  49.000.000 (Forty-nine million  )  (non-denominated  ) rubles, including denomination 49,000 (Forty nine thousand  )  rubles.

The amount of money in rubles,  paid in  for placed shares  -  49.000.000 (Forty-nine million  )  (non-  denominated  ) rubles, including denomination 49,000 (forty-nine thousand  ) rubles , and the amount to be used as payment of issued under the contract   the establishment of the Company - 49.000.000 (forty nine million  )  (non -denominated  )  rubles, including denomination 49,000 (forty-nine thousand  ) rubles.
The amount of foreign currency expressed in rubles at   the Central Bank of the Russian Federation at the time of making, paid  for placed shares  -  not as well as the amount of foreign currency denominated in rubles at the Central Bank of the Russian Federation on the date of approval of the report on the issue of securities, be recorded in the payment of outstanding securities in accordance with the agreement on the establishment of the company - no.
Value of other assets, as payment company - no.

6. Shareholders holding not less than 2% of the ordinary shares:
**JSC "SIGMA"** -32 340 (thirty-two thousand  three hundred and forty) shares  - 66%;
**International  Trade  Company Horizon International Trading  Ltd** - 16,660 (sixteen thousand six hundred sixty) shares - 34%.

7. Board of Directors  of JSC "SOVEX"  not  elected.

8. collegial executive body  of JSC "SOVEX" was not created.

9. Individual acting as sole executive body - They  Vasily  Mikhailovich -  Director General of  JSC "SOVEX" positions in other organizations has no shares  of the Company, the Issuer does not own.

## SOVEX (Soveksna Nevsky)

Full name: **Closed Joint Stock Company "Sovex"**

Short name: **JSC "Sovex" on Nevsky**

INN: **7813031424**

Issuer Code: **04124-J**

Location: **191025, St. Petersburg, Nevsky Prospect, 100 square meters. 4**

Postal address: **191025, St. Petersburg, Nevsky Prospect, 100 square meters. 4**

Phone: **219-41-90**

Issues of securities

| Rating | Number of securities | State. registration | Method of placement | Period / date of placement | Current state | Actually taken | Date of registration of the report |
|---|---|---|---|---|---|---|---|
| **1. Ordinary** | | | | | | | |
| 1 | 49000 | 01.07.1996 72-1-5060 | acquisition of shares of the founders of the society | 11.07.1995 | placement completed | 49000 | |
| ... Report on the results of | | | | | | | |

# EXHIBIT D

# СПРАВКА № 51294

Пострадавший ФРЕЙДЗОН Максим Робертович 28.11.1966 г.р. находился на излечении в клинике военно-полевой хирургии Военно-медицинской академии с 21 декабря по 03 февраля 2003г. с диагнозом:

Тяжелая сочетанная травма головы, живота, конечностей. ОЧМТ. Сотрясение головного мозга. Множественные рвано-ушибленные раны левой теменной области, верхнего века левого глаза. Закрытая травма живота с разрывом тощей кишки, ушибом и разрывом капсулы головки поджелудочной железы, ушибом стенки 12-перстной кишки, множественными разрывами и ушибом брыжейки тонкой кишки, большого сальника. Разлитой фиброзный перитонит, реактивная фаза. Закрытый перелом правой малоберцовой кости в верхней трети, внутренней лодыжки правого голеностопного сустава с разрывом дистального межберцового синдесмоза, подвывихом стопы кнаружи.

При поступлении выполнены лапаротомия, ушивание раны тощей кишки, разрывов брыжейки тонкой кишки, большого сальника, холецистостомия, дренирование сальниковой сумки, брюшной полости, забрюшинного пространства, гипсовая иммобилизация правого голеностопного сустава.

Послеоперационный период осложнился развитием посттравматического панкреатита, пареза кишечника, трахеобронхита, энцефалопатией смешанного генеза, присоединением уроинфекции, дисбактериоза.

Получал лечение: режим, диета, инфузионно-трансфузионная терапия, альбумин, клафоран, абактал, метрогил, тиенам, неграм, палин, канефрон, октреотид, гордокс, дексаметазон, актовегин, трентал, маалокс, квамател, линекс, хилак-форте, тиапредал.

В настоящее время состояние удовлетворительное. По просьбе родственников пострадавший выписывается.

Общий анализ крови: Er – 4,51×10¹²/л, Hb – 148 г/л, L – 8,7×10⁹/л, СОЭ – 11 мм/час (П – 44%, Э – 5%, Л – 40%, М – 9%, Пя – 1%, Ся – 43%). Общий анализ мочи: отн. пл. – 1,010, реакция – 7,5, белок, сахар – не обн., лейкоциты – един. в п/зр., эпителий мочевыводящих путей – един. в п/зр. Биохимический анализ крови: глюкоза – 5,89 ммоль/л, мочевина – 3,5 ммоль/л, креатинин – 79,4 fmol/l, общий билирубин – 10,5 fmol/l, общий белок – 69,8 г/л, АЛТ – 31,1 е/л, АСТ – 25,6 е/л, ЩФ – 69,9 е/л, ГГТП – 24,3 е/л, амилаза – 32 ед. Кровь на RW, HBS Ag, Анти-HCV, Ф-50 – отрицательно.

R-графия груди, УЗИ живота без патологии. Результаты ЯМРТ головы, живота, R-графии правого голеностопного сустава на руках.

Рекомендовано: - соблюдение режима, диеты, проведение плановой восстановительной операции на правом голеностопном суставе.

ПОМОЩНИК НАЧАЛЬНИКА КЛИНИКИ     С. АГАПОВ

НАЧАЛЬНИК III ОТДЕЛЕНИЯ     А. СИНГАЕВСКИЙ

ЛЕЧАЩИЙ ВРАЧ     А. ГОНЧАРОВ

TRANSLATION OF MEDICAL EVALUATION OF MAX FREIDZON

Was admitted with the following diagnoses:

Multiple life-threatening injuries including head trauma, abdominal and extremities injuries. Open head trauma, concussion, multiple open wounds of the left temporal area and left upper eyelid. Blunt abdominal trauma with associated multiple traumatic perforations of small intestine, traumatic injury of the head of the pancreas with ruptured capsule, blunt injury of the duodenum. The injuries were complicated by fibrosing reactive peritonitis. Lower extremities trauma included closed fracture of right proximal tibia and right medial malleolus with disruption of syndesmosis, partial dislocation of right ankle.